Jill J. Parker (SBN 274230)
jill@parkerminne.com
**PARKER & MINNE, LLP**
700 S. Flower Street, Suite 1000
Los Angeles, CA 90017
Tel: (310) 882-6833; Fax (310) 889-0822

Danielle L. Perry (SBN 292120)
dperry@masonllp.com
**MASON LLP**
5335 Wisconsin Avenue NW, Suite 640
Washington, D.C. 20015
Tel: (202) 429-2290

*Counsel for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RHONDA JORDAN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DESIGNED RECEIVABLE SOLUTIONS, INC.<br><br>Defendant. | Case No.:  8:24-cv-01503 <br><br>**CLASS ACTION COMPLAINT:** |

## CLASS ACTION COMPLAINT

1.     Plaintiff Rhonda Jordan ("Plaintiff"), individually and on behalf of all others similarly situated, brings this action against Defendant Designed Receivable Solutions, Inc. ("DRSI" or "Defendant") to obtain damages, restitution, and injunctive relief from Defendant. Plaintiff makes the following allegations upon information and belief, except as to their own actions, the investigation of their counsel, and facts that are a matter of public record.

## NATURE OF THE ACTION

2.     This class action arises out of Defendant Designed Receivable Solutions, Inc.'s failures to properly secure, safeguard, encrypt, and/or timely and adequately destroy Plaintiff's and Class Members' sensitive personal identifiable information that it had acquired and stored for its business purposes. On January 22, 2024, DRSI realized that its security failures resulted in a massive data breach ("Data Breach") of highly sensitive documents and information stored on its computer network, and that the cybercriminals exfiltrated information pertaining to certain current and former clients' patients, including Plaintiff and Class Members.

3.     Defendant's data security failures allowed a targeted cyberattack in or before January 2024 to compromise Defendant's network (the "Data Breach") that contained personally identifiable information ("PII") and protected health information ("PHI") (collectively, "the Private Information") of Plaintiff and other individuals ("the Class").

4.     The Private Information of least **498,000** similarly situated persons, including Plaintiff, was affected and exfiltrated in the massive and preventable cyberattack purportedly discovered by Defendant on January 22, 2024.

5.     According to a notice DRSI posted on its website, which is similar to the one sent to Plaintiff,

On January 22, 2024, DRSI detected suspicious activity in its network environment. Upon discovery of this incident, DRSI promptly took steps to secure its network and engaged a specialized cybersecurity firm to investigate the nature and scope of the incident. As a result of the investigation, DRSI learned that an unauthorized actor accessed certain files and data stored within our network. DRSI also conducted an examination of its systems and networks using all information available to determine the potential impact and the security of data housed on its servers. DRSI continued to investigate this issue using the assistance of third-party cybersecurity specialists. The investigation determined an unauthorized actor exfiltrated certain data from servers. DRSI subsequently undertook a time-consuming and detailed review of the data stored on the servers at the time of this incident to understand the contents of that data and to whom that data relates. On March 8, 2024, we completed this extensive review process and identified that information pertaining to certain current and former clients' patients was present in the affected files.[1]

6.     Defendant's website notice further recommended that "individuals to remain vigilant against incidents of identity theft and fraud by reviewing your account statements, explanation of benefits forms, and monitoring your free credit reports for suspicious activity and to detect errors." [2]

7.     Despite learning of the Data Breach on or about January 22, 2024, and determining that specific individuals' Private Information was involved in the breach by March 8, 2024, Defendant did not begin sending notices of the Data Breach (the

---

[1] *See* Notice Letters, Collective Exhibit A.
[2] *See* link to "Notice of Data Event" on https://www.drsi360.com/ (last accessed July 8, 2024); also attached as Collective Exhibit A.

CLASS ACTION COMPLAINT

"Notice of Data Breach Letter") until June 21, 2024. *See* Plaintiff Jordan's Notice Letter, Collective Exhibit A.

8. The Private Information compromised in the Data Breach included certain personal or protected health information of affected individuals, including Plaintiff. This Private Information included, but is not limited to: name, address, date of birth, Social Security number, health insurance information, and medical information (dates of service).[3]

9. The Private Information compromised in what DRSI refers to as a "Data Privacy Event" in which it "detected suspicious activity in its network environment" and which its "investigation determined an unauthorized actor exfiltrated certain data from servers."[4] In other words, the cybercriminals intentionally targeted DRSI for the highly sensitive Private Information it stores on its computer network, attacked the insufficiently secured network, then exfiltrated highly sensitive PII and PHI, including but not limited to Social Security numbers. As a result, the Private Information of Plaintiff and Class remains in the hands of those cyber-criminals.

10. The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect individuals' Private Information with which it was entrusted for business purposes.

11. Plaintiff brings this class action lawsuit on behalf of themselves and all others similarly situated to address Defendant's inadequate safeguarding of Class Members' Private Information that it collected and maintained, and for failing to provide timely and adequate notice to Plaintiff and other Class Members that their information had been subject to the unauthorized access of an unknown third party

---

[3] Collective Exhibit A.
[4] *See* Plaintiff Notice Letter, attached as Exhibit A.

and including in that notice precisely what specific types of information were accessed and taken by cybercriminals.

12.    Defendant maintained the Private Information in a reckless manner. In particular, the Private Information was maintained on Defendant DRSI's computer network in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to Defendant, and thus Defendant was on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

13.    Defendant disregarded the rights of Plaintiff and Class Members (defined below) by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard Plaintiff's and Class Members' Private Information; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiff and Class Members with prompt and full notice of the Data Breach.

14.    In addition, Defendant DRSI failed to properly monitor the computer network and systems that housed the Private Information. Had DRSI properly monitored its property, it would have discovered the intrusion sooner rather than allowing cybercriminals an unknown amount of time of unimpeded access to the PII and PHI of Plaintiff and Class Members.

15.    Armed with the Private Information accessed in the Data Breach, data thieves can commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, filing false medical claims using

Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

16.     As a result of the Data Breach, Plaintiff and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must now and for years into the future closely monitor their financial accounts to guard against identity theft.

17.     Plaintiff and Class Members may also incur out of pocket costs for, *e.g.*, purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

18.     Through this Complaint, Plaintiff seeks to remedy these harms on behalf of themselves and all similarly situated individuals whose Private Information was accessed during the Data Breach (the "Class").

19.     Accordingly, Plaintiff brings this action against Defendant seeking redress for its unlawful conduct, and asserting claims for: (i) negligence, (ii) negligence *per se*, (iii) breach of implied contract, (iv) breach of fiduciary duty; (v) unjust enrichment.

20.     Plaintiff seeks remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, as well as long-term and adequate credit monitoring services funded by Defendant, and declaratory relief.

## **PARTIES**

21.     Plaintiff Rhonda Jordan is and at all times mentioned herein was an individual citizen of the State of Alabama, residing in the city of Citronelle (Mobile County), and was a patient of Springhill Emergency Physicians, a client of DRSI.

Plaintiff Jordan received notice of the Data Breach dated June 21, 2024, attached in Collective Exhibit A.

22.     Defendant Designed Receivables Solutions, Inc. is a Nevada stock corporation headquartered in Orange County, California. It can be served through its registered agent Paul Farinacci, Jr. at its principal place of business located at 10833 Valley View Street, Suite #415, Cypress, California 90630.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class, including Plaintiff, is a citizen of a state different from Defendant.

24.     The Court has general personal jurisdiction over Defendant because, personally or through its agents, Defendant operates, conducts, engages in, or carries on a business or business venture in this State; it is registered with the Secretary of State as a corporation; it maintains its headquarters in California; and committed tortious acts in California.

25.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because it is the district within which DRSI maintains its headquarters and has the most significant contacts.

## FACTUAL ALLEGATIONS

### *Defendant's Business*

26.     According to its website, Defendant Designed Receivables Solutions, Inc. was created to provide cash flow and accounts receivable ("A/R") solutions to healthcare providers "while ensuring the highest level of patient and physician satisfaction."[5]

---

[5] https://www.drsi360.com/solutions (last accessed July 8, 2024).

27.    It offers financial "recovery solutions that are tailor made to facilitate the specific needs of [its] clients throughout their A/R cycle. Each of these solutions utilizes a dedicated team that is trained to specialize in each of these areas:

- Early-Out Self-Pay Program
- Third-Party Pre-Collect Recovery
- Primary Bad Debt Collections
- Secondary Bad Debt Collections
- Special Projects & Consultations.[6]

28.    It also explains: "At DRSI, our business is 100% focused on healthcare. We provide custom designed solutions for all sizes & types of healthcare businesses, from neighborhood practices to major metropolitan hospitals and chains across the country. Our solutions are designed to meet the unique requirements of each client, incorporating one or any combination of our solutions."[7]

29.    In the ordinary course of providing services to its clients, Defendant DRSI, its clients and their patients must provide (and Plaintiff did provide) Defendant DRSI with sensitive, personal, and private information, such as their:

- Name, address, phone number, and email address;
- Date of birth;
- Social Security number;
- Marital status;
- Employer with contact information;
- Primary and secondary insurance policy holders' name, address, date of birth, and Social Security number;
- Demographic information;
- Driver's license or state or federal identification;

---

[6] *Id.*
[7] *Id.*

CLASS ACTION COMPLAINT

- Information relating to the individual's medical and medical history;
- Insurance information and coverage; and
- Banking and/or credit card information.

30.    Defendant also creates and stores medical records and other protected health information for its patients, records of treatments and diagnoses.

31.    In its Privacy Policy located on its website and upon information and belief, in other documents with provides to its clients and their patients, DRSI claims:

**Our Commitment to Privacy**

Your privacy is important to us. To better protect your privacy, we provide this notice explaining our online information practices.

**The Way We Use Information**

We do not use Customer Information we have obtained about you for any purpose other than to service or manage your account(s) in the ordinary course of our business.

**Our Commitment to Data Security**

This site uses reasonable security measures in place to protect Personal Information against loss, misuse, disclosure, or destruction of the information under our control. . . .[8]

32.    Defendant also admits that it "has collected the following categories of personal information from consumers within the past twelve (12) months":

(a)  health insurance information;

(b)  personal identifying information, like name, alias, address and account name and number, financial information, social security number, as well as other identifying information;

(c)  characteristics such as age, gender, etc.;

---

[8] https://www.drsi360.com/privacy-policy (last accessed July 8, 2024).

(d)  retail information;

(e)  audio, electronic, or similar information including call recordings. Recordings are made when the consumer has a telephone conversation with us.  (NOTE: calls made by DRSI360 to consumers and calls made by consumers to DRSI360 are recorded and may be monitored);

(f)  commercial information, including records of personal property, products or services purchased;

(g) professional and employment related information;

(h)  educational information, degree, etc.;

(i)  inferences drawn from other information. [9]

33.    It "collects most of this personal information from our clients or from you or your authorized representative by telephone or by electronic or other written communications. We may also collect information from our service providers, from third parties and from third parties with your consent." [10]

34.    As a third-party collector of protected health information (PHI), DRSI is required to follow the statutory requirements of HIPAA, including notice within 60 days in case of a data breach. DRSI's Privacy Notice makes clear that it understands that its clients' patients' Private Information is highly sensitive and must be protected by law.

35.    Defendant DRSI agreed to and undertook legal duties to maintain the protected health and personal information entrusted to it by its clients and by Plaintiff and Class Members safely, confidentially, and in compliance with all applicable laws, including the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, and the Health Insurance Portability and Accountability Act ("HIPAA").

---

[9] *Id.*
[10] *Id.*

CLASS ACTION COMPLAINT

36.    Yet, through its failure to properly secure the Private Information of Plaintiff and Class, DRSI failed to meet its own promises of privacy.

37.    The data that was held by Defendant DRSI in its computer system and network, and subsequently accessed and exfiltrated by criminals, included the highly sensitive Private Information of Plaintiff and Class Members.

### *The Data Breach*

38.    A data breach occurs when cyber criminals intend to access and steal Private Information that has not been adequately secured by a business entity like Designed Receivables Solutions, Inc.

39.    According to Defendant's website Notice, it learned of a cyber attack on its computer systems on or around January 22, 2024, and its investigation was complete by March 8, 2024. However, DRSI does not explain when the Data Breach actually occurred or why it delayed even longer before it sent notice letters to affected individuals, including Plaintiff and the Class.[11]

40.    DRSI's third-party cybersecurity specialists determined that an unauthorized actor exfiltrated certain data from servers.[12]

41.    In late June, 2024, months after DRSI admitted it knew that the Class's Private Information was accessed and exfiltrated by cybercriminals, Plaintiff and the Class began receiving their notices of the Data Breach informing them that its investigation determined that their Private Information was accessed.

42.    DRSI's notice letters admit that "the following types of information may have been impacted: name, address, date of birth, Social Security number, health insurance information, and medical information (dates of service). The type of information at issue varies for each person."[13]

---

[11] *See* Collective Exhibit A.
[12] *Id.*
[13] *Id.*

CLASS ACTION COMPLAINT

43.     DRSI's notice letters list time-consuming, generic steps that victims of data security incidents can take, such as reviewing account statements, getting a copy of all three credit reports, placing fraud alerts on their accounts, placing credit freezes, or notifying law enforcement about suspicious financial account activity.[14]

44.     Other than providing one year of single bureau monitoring and credit services Plaintiff and Class Members would have to affirmatively sign up for and a call center number that victims may contact with questions, DRSI offered no other substantive steps to help victims like Plaintiff and Class Members to protect themselves.[15]

45.     DRSI's data security obligations were particularly important given the substantial increase in cyberattacks in recent years.

46.     DRSI knew or should have known that its electronic records would be targeted by cybercriminals.

47.     DRSI had obligations created by HIPAA as a healthcare associated business, the FTCA, contract, industry standards, common law, state law, and representations made to its clients and Plaintiff and Class Members in its Privacy Policy, promising to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

48.     Plaintiff and Class Members provided their Private Information to Defendant (both directly and indirectly) with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

/
/
/
/
/

---

[14] *Id.*
[15] *Id.*

CLASS ACTION COMPLAINT

### The Data Breach was a
### Foreseeable Risk of which Defendant was on Notice.

49.     It is well known that PII, including Social Security numbers in particular, is a valuable commodity and a frequent, intentional target of cyber criminals. Companies that collect such information, including DRSI, are well-aware of the risk of being targeted by cybercriminals.

50.     Individuals place a high value not only on their PII, but also on the privacy of that data. Identity theft causes severe negative consequences to its victims, as well as severe distress and hours of lost time trying to fight against the impact of identity theft.

51.     A data breach increases the risk of becoming a victim of identity theft. Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice, "[a] direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss." [16]

52.     Individuals, like Plaintiff and Class members, are particularly concerned with protecting the privacy of their Social Security numbers, which are the key to stealing any person's identity and is likened to accessing your DNA for hacker's purposes.

---

[16] "Victims of Identity Theft, 2018," U.S. Department of Justice (April 2021, NCJ 256085) available at: https://bjs.ojp.gov/content/pub/pdf/vit18.pdf (last accessed July 8, 2024).

53.     Data Breach victims suffer long-term consequences when their Social Security numbers are taken and used by hackers. Even if they know their Social Security numbers are being misused, Plaintiff and Class Members cannot obtain new numbers unless they become a victim of Social Security number misuse.

54.     The Social Security Administration has warned that "a new number probably won't solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So, using a new number won't guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same."[17]

55.     In 2021, there were a record 1,862 data breaches, surpassing both 2020's total of 1,108 and the previous record of 1,506 set in 2017.[18]

56.     Additionally in 2021, there was a 15.1% increase in cyberattacks and data breaches since 2020. In a poll done on security executives, they have predicted an increase in attacks from "social engineering and ransomware" as nation-states and cybercriminals grow more sophisticated. Unfortunately, these preventable causes will largely come from "misconfigurations, human error, poor maintenance, and unknown assets."[19]

---

[17] https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed July 8, 2024).
[18] https://www.cnet.com/tech/services-and-software/record-number-of-data-breaches-reported-in-2021-new-report-says/ (last accessed July 8, 2024).
[19] https://www.forbes.com/sites/chuckbrooks/2022/06/03/alarming-cyber-statistics-for-mid-year-2022-that-you-need-to-know/?sh=176bb6887864 (last accessed July 8, 2024).

57.    Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, and hopefully can ward off a cyberattack.

58.    According to an FBI publication, "[r]ansomware is a type of malicious software, or malware, that prevents you from accessing your computer files, systems, or networks and demands you pay a ransom for their return. Ransomware attacks can cause costly disruptions to operations and the loss of critical information and data." [20] This publication also explains that "[t]he FBI does not support paying a ransom in response to a ransomware attack. Paying a ransom doesn't guarantee you or your organization will get any data back. It also encourages perpetrators to target more victims and offers an incentive for others to get involved in this type of illegal activity."[21]

59.    Despite the prevalence of public announcements of data breach and data security compromises, and despite its own acknowledgments of data security compromises, and despite its own acknowledgment of its duties to keep PII private and secure, DRSI failed to take appropriate steps to protect the PII of Plaintiff and the proposed Class from being compromised.

**Data Breaches are Rampant in Healthcare and its Related Services.**

60.    Defendant's data security obligations were particularly important given the substantial increase in data breaches in the healthcare industry preceding the date of the breach.

61.    According to an article in the HIPAA Journal posted on October 14, 2022, cybercriminals hack into medical practices for their "highly prized" medical records. "[T]he number of data breaches reported by HIPAA-regulated entities

---

[20] https://www.fbi.gov/how-we-can-help-you/safety-resources/scams-and-safety/common-scams-and-crimes/ransomware (last accessed July 8, 2024).
[21] *Id.*

continues to increase every year. 2021 saw 714 data breaches of 500 or more records reported to the [HHS' Office for Civil Rights] OCR – an 11% increase from the previous year. Almost three-quarters of those breaches were classified as hacking/IT incidents."[22]

62.    Healthcare organizations and their related service providers, like DRSI, are easy targets because "even relatively small healthcare providers may store the records of hundreds of thousands of patients. The stored data is highly detailed, including demographic data, Social Security numbers, financial information, health insurance information, and medical and clinical data, and that information can be easily monetized."[23]

63.    The HIPAA Journal article goes on to explain that patient records, like those stolen from DRSI, are "often processed and packaged with other illegally obtained data to create full record sets (fullz) that contain extensive information on individuals, often in intimate detail." The record sets are then sold on dark web sites to other criminals and "allows an identity kit to be created, which can then be sold for considerable profit to identity thieves or other criminals to support an extensive range of criminal activities."[24]

64.    Data breaches such as the one experienced by Defendant DRSI have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, can prepare for, and hopefully can ward off a potential attack.

---

[22] https://www.hipaajournal.com/why-do-criminals-target-medical-records/ (last accessed July 8, 2024).
[23] *Id.*
[24] *Id.*

65.    In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations experienced cyberattacks in the past year.[25]

66.    HHS data shows more than 39 million patients' information was exposed in the first half of 2023 in nearly 300 incidents and that healthcare beaches have doubled between 2020 and 2023, according to records compiled from HHS data by Health IT Security.[26]

67.    According to Advent Health University, when an electronic health record "lands in the hands of nefarious persons the results can range from fraud to identity theft to extortion. In fact, these records provide such valuable information that hackers can sell a single stolen medical record for up to $1,000."[27]

68.    The significant increase in attacks in the healthcare industry, and attendant risk of future attacks, is widely known to the public and to anyone in that industry, including Defendant DRSI, which provides services directly to healthcare organizations.

### *Defendant Fails to Comply with FTC Guidelines.*

69.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

70.    In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses.  The guidelines note that businesses should protect the personal patient

---

[25] *See* Maria Henriquez, Iowa City Hospital Suffers Phishing Attack, Security Magazine (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack (last accessed July 8, 2024).
[26] https://healthitsecurity.com/features/biggest-healthcare-data-breaches-reported-this-year-so-far (last accessed July 8, 2024).
[27] https://www.ahu.edu/blog/data-security-in-healthcare (last accessed July 8, 2024).

information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[28] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[29]

71.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

72.    The FTC has brought enforcement actions against businesses, like that of DRSI, for failing to adequately and reasonably protect individuals' PII, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

73.    These FTC enforcement actions include actions against healthcare providers like Defendant. *See, e.g., In the Matter of LabMD, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016)

---

[28] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last accessed July 8, 2024).
[29] *Id.*

CLASS ACTION COMPLAINT

("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

74.    Defendant failed to properly implement basic data security practices.

75.    Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to individuals' PII and PHI constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

76.    Defendant was at all times fully aware of its obligation to protect the PII and PHI of Plaintiff and Class. Defendant was also aware of the significant repercussions that would result from its failure to do so.

### *Defendant Fails to Comply with Industry Standards.*

77.    As shown above, experts studying cyber security routinely identify healthcare service providers as being particularly vulnerable to cyberattacks because of the value of the PII and PHI which they collect and maintain.

78.    Several best practices have been identified that a minimum should be implemented by Defendant, including but not limited to: educating all employees; utilizing strong passwords; creating multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; using multi-factor authentication; protecting backup data, and; limiting which employees can access sensitive data.

79.    Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

80.     Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

81.     These frameworks are existing and applicable industry standards in the healthcare industry, yet Defendant failed to comply with these accepted standards, thereby opening the door to and failing to thwart the Data Breach.

### *Defendant's Conduct Violates HIPAA.*

82.     HIPAA requires covered entities such as Defendant to protect against reasonably anticipated threats to the security of sensitive patient health information (PHI).

83.     Covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.

84.     Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, *et seq*. These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling PII like the data Defendant left unguarded. The HHS subsequently promulgated multiple regulations under authority of the Administrative Simplification provisions of HIPAA. These rules include 45 C.F.R. § 164.306(a)(1-4); 45 C.F.R. § 164.312(a)(1); 45 C.F.R. § 164.308(a)(1)(i); 45 C.F.R. § 164.308(a)(1)(ii)(D), and 45 C.F.R. § 164.530(b).

85.    A Data Breach such as the one Defendant experienced, is considered a breach under the HIPAA rules because there is an access of PHI not permitted under the HIPAA Privacy Rule:

> A breach under the HIPAA Rules is defined as, "...the acquisition, access, use, or disclosure of PHI in a manner not permitted under the [HIPAA Privacy Rule] which compromises the security or privacy of the PHI." *See* 45 C.F.R. 164.40.

86.    Defendant's Data Breach resulted from a combination of insufficiencies that demonstrate it failed to comply with safeguards mandated by HIPAA regulations.

87.    Further, Defendant's excessively long delay in providing notice to Plaintiff and the Class (in excess of 60 days) violates HIPAA.

### *Defendant has Breached its Obligations to Plaintiff and Class.*

88.    Defendant breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and individuals' Private Information. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a.    Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b.    Failing to adequately protect affected persons' Private Information;

c.    Failing to properly monitor its own data security systems for existing intrusions;

d.    Failing to ensure, as a vendor to healthcare agencies and with access to the clients' protected health data, that it employed reasonable security procedures;

CLASS ACTION COMPLAINT

e.  Failing to ensure the confidentiality and integrity of electronic PHI it created, received, maintained, and/or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

f.  Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

g.  Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1)(i);

h.  Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

i.  Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

j.  Failing to protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

k.  Failing to ensure compliance with HIPAA security standard rules by Defendant's workforce in violation of 45 C.F.R. § 164.306(a)(4);

l.  Failing to train all members of Defendant's workforce effectively on the policies and procedures regarding PHI as necessary and appropriate for the members of their workforces to carry out their

CLASS ACTION COMPLAINT

functions and to maintain security of PHI, in violation of 45 C.F.R. § 164.530(b); and/or

m. Failing to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as it had not encrypted the electronic PHI as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key" (45 CFR 164.304 definition of encryption).

89.    As the result of maintaining its computer systems in manner that required security upgrading, inadequate procedures for handling emails containing ransomware or other malignant computer code, and inadequately trained employees who opened files containing the ransomware virus, Defendant negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information.

90.    Accordingly, as outlined below, Plaintiff and Class Members now face an increased risk of fraud and identity theft.

### Data Breaches Put Consumers at an Increased Risk Of Fraud and Identify Theft.

91.    Data Breaches such as the one experienced by Plaintiff and the Class are especially problematic because of the disruption they cause to the overall daily lives of victims affected by the attack.

92.    In 2019, the United States Government Accountability Office released a report addressing the steps consumers can take after a data breach.[30] Its appendix of steps consumers should consider, in extremely simplified terms, continues for five pages. In addition to explaining specific options and how they can help, one column

---

[30] https://www.gao.gov/assets/gao-19-230.pdf (last accessed July 8, 2024). *See* attached as Ex. B.

CLASS ACTION COMPLAINT

of the chart explains the limitations of the consumers' options. *See* GAO chart of consumer recommendations, reproduced and attached as Exhibit B.  It is clear from the GAO's recommendations that the steps Data Breach victims (like Plaintiff(s) and Class) must take after a breach like Defendant's are both time consuming and of only limited and short-term effectiveness.

93.    The GAO has long recognized that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record," discussing the same in a 2007 report as well ("2007 GAO Report"). [31]

94.    The FTC, like the GAO (*see* Exhibit B), recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[32]

95.    Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

96.    Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information.

---

[31] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf (last accessed July 8, 2024) ("2007 GAO Report").

[32] *See* https://www.identitytheft.gov/Steps (last accessed July 8, 2024).

97.    Theft of Private Information is also gravely serious. PII/PHI is a valuable property right.[33]

98.    It must also be noted there may be a substantial time lag – measured in years -- between when harm occurs versus when it is discovered, and also between when Private Information and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which has conducted studies regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

*See* 2007 GAO Report, at p. 29.

99.    Private Information and financial information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

100.    There is a strong probability that the entirety of the stolen information has been dumped on the black market or will be dumped on the black market, meaning Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiff and Class Members must vigilantly monitor their financial and medical accounts for many years to come.

---

[33] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

101.   As the HHS warns, "PHI can be exceptionally valuable when stolen and sold on a black market, as it often is. PHI, once acquired by an unauthorized individual, can be exploited via extortion, fraud, identity theft and data laundering. At least one study has identified the value of a PHI record at $1000 each."[34]

102.   Furthermore, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[35] Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[36] Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

103.   Moreover, it is not an easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[37]

---

[34] https://www.hhs.gov/sites/default/files/cost-analysis-of-healthcare-sector-data-breaches.pdf at 2 (citations omitted) (last accessed July 8, 2024).

[35] *Identity Theft and Your Social Security Number*, Social Security Administration (last accessed March 16, 2023). (2018) at 1. Available at https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed July 8, 2024).

[36] *Id.* at 4.

[37] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-

104.    This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[38]

105.    In recent years, the medical and financial services industries have experienced disproportionally higher numbers of data theft events than other industries. Defendant therefore knew or should have known this and strengthened its data systems accordingly. Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

## PLAINTIFF'S EXPERIENCES

### *Plaintiff Rhonda Jordan*

106.    Plaintiff Rhonda Jordan is and at all times mentioned herein was an individual citizen residing in the State of Alabama.

107.    Plaintiff Jordan is and was a patient of Springhill Emergency Physicians, a client of DRSI at all times relevant to this Complaint. On or about July 1, 2024, Plaintiff Jordan received a Notice of Data Breach Letter, related to DRSI's Data Breach that is dated June 21, 2024. *See* Exhibit A.

108.    The Notice Letter that Plaintiff received states that her PII and PHI were accessed including her name, address, Social Security number, and date of birth were potentially accessed and acquired." *See* Ex. A.

---

by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last accessed July 8, 2024).

[38] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Computer World (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last accessed July 8, 2024).

109.    Plaintiff Jordan is especially alarmed by the fact that her Social Security number was identified as among the breached data on DRSI's computer system.

110.    Since the Data Breach, Plaintiff Jordan monitors her financial accounts for about two hours per week. This is more time than she spent prior to learning of the DRSI's Data Breach. Having to do this every week not only wastes her time, which she could use for more productive activities of her choosing as a result of DRSI's negligence, but it also causes her great anxiety.

111.    Plaintiff Jordan has also had to spend time changing her account passwords as a result of the Data Breach and Defendant's advice to her.

112.    Plaintiff Jordan has been notified that her Private Information has been found on the dark web.

113.    Starting in approximately mid-June 2024, Plaintiff Jordan began receiving an excessive number of spam calls on the same cell phone number provided to DRSI on her records. She now receives about 40 spam calls a day, which is very invasive of per privacy in addition to being stressful. These calls are a distraction, must be deleted, and waste time each day. Once the Notice Letter was delivered, and given the timing of the Data Breach, she believes that the calls are related to her stolen PII.

114.    Since DRSI's Data Breach, Plaintiff Jordan has been receiving messages about credit cards, but she has not personally applied for any credit cards. She believes these are related to the Data Breach.

115.    Plaintiff Jordan is aware that cybercriminals often sell Private Information, and one stolen, it is likely to be abused months or even years after DRSI's Data Breach.

116.    Had Plaintiff Jordan been aware that DRSI's computer systems were not secure, she would not have entrusted DRSI or its client Springhill with her PII and PHI.

117.    Plaintiff Jordan reasonably believes that DRSI still retains her PII and PHI and maintains it in an insufficiently protected manner. Should it suffer another breach, her PII and PHI are likely to be even further publicly exposed on the dark web. So long as her Private Information is not encrypted or deleted from DRSI's network, she is at risk of identity theft.

## PLAINTIFF'S AND CLASS MEMBERS' INJURIES

118.    To date, Defendant DRSI has done absolutely nothing to compensate Plaintiff and Class Members for the damages they sustained in the Data Breach.

119.    Defendant DRSI has merely offered one year, one bureau of credit monitoring services through CyberScout, a tacit admission that its failure to protect their Private Information has caused Plaintiff and Class great injuries. *See* Ex. A. These limited services are inadequate when victims are likely to face many years of identity theft.

120.    DRSI's offer fails to sufficiently compensate victims of the Data Breach, who commonly face multiple years of ongoing identity theft, and it entirely fails to provide any compensation for its unauthorized release and disclosure of Plaintiff's and Class Members' Private Information, out of pocket costs, and the time they are required to spend attempting to mitigate their injuries.

121.    Furthermore, Defendant DRSI's credit monitoring offer and advice (*see* Ex. A) to Plaintiff and Class Members squarely places the burden on Plaintiff and Class Members, rather than on the Defendant, to investigate and protect themselves from Defendant's tortious acts resulting in the Data Breach. Defendant merely sent instructions to Plaintiff and Class Members about actions they can affirmatively take to protect themselves.

122.   Plaintiff and Class Members have been damaged by the compromise and exfiltration of their Private Information in the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

123.   Plaintiff's and Class Members' Private Information was compromised and exfiltrated by cyber-criminals as a direct and proximate result of the Data Breach.

124.   Plaintiff and Class were damaged in that their Private Information is now in the hands of cyber criminals, sold and potentially for sale for years into the future.

125.   As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been placed at an actual, imminent, and substantial risk of harm from fraud and identity theft.

126.   As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach.

127.   Plaintiff and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft. Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

128.   Plaintiff and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiff and Class Members.

129.   Plaintiff and Class Members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach.

Numerous courts have recognized the propriety of loss of value damages in related cases.

130.   Plaintiff and Class Members have spent and will continue to spend significant amounts of time to monitor their financial accounts and records for misuse.

131.   Plaintiff and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

     a.  Finding fraudulent charges;

     b.  Canceling and reissuing credit and debit cards;

     c.  Purchasing credit monitoring and identity theft prevention;

     d.  Monitoring their medical records for fraudulent charges and data;

     e.  Addressing their inability to withdraw funds linked to compromised accounts;

     f.  Taking trips to banks and waiting in line to obtain funds held in limited accounts;

     g.  Placing "freezes" and "alerts" with credit reporting agencies;

     h.  Spending time on the phone with or at a financial institution to dispute fraudulent charges;

     i.  Contacting financial institutions and closing or modifying financial accounts;

     j.  Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

     k.  Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled; and

CLASS ACTION COMPLAINT

l.   Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

132.   Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing personal and financial information as well as health information is not accessible online and that access to such data is password-protected.

133.   Further, as a result of Defendant's conduct, Plaintiff and Class Members are forced to live with the anxiety that their Private Information —which contains the most intimate details about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

134.   Defendant's delay in identifying and reporting the Data Breach caused additional harm. In a data breach, time is of the essence to reduce the imminent misuse of PII and PHI. Early notification helps a victim of a Data Breach mitigate their injuries, and in the converse, delayed notification causes more harm and increases the risk of identity theft.  Here, DRSI knew of the breach **since January 2024** and did not notify the victims until late June 2024. Yet DRSI offered no explanation of purpose for the delay. This delay violates HIPAA and other notification requirements and increases the injuries to Plaintiff and Class.

## CLASS ACTION ALLEGATIONS

135.   Plaintiff brings this action on behalf of themselves and on behalf of all other persons similarly situated.

136.   Plaintiff proposes the following Class definition, subject to amendment as appropriate:

> All persons whose Private Information was compromised as a result of
> the Data Breach discovered by Designed Receivables Solutions, Inc. in
> or about March 2024 and to whom it provided notice on or about June
> 2024 (the "Class").

137.   Excluded from the Class are Defendant's officers and directors, and any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are Members of the judiciary to whom this case is assigned, their families and Members of their staff.

138.   Plaintiff hereby reserves the right to amend or modify the class definitions with greater specificity or division after having had an opportunity to conduct discovery. The proposed Class meets the criteria for certification Fed. R. Civ. P. Rule 23.

139.   <u>Numerosity</u>, Fed. R. Civ. P. 23(a)(1): The Members of the Class are so numerous that joinder of all of them is impracticable. The exact number of Class Members is unknown to Plaintiff at this time, but the number is believed to be in excess of **498,000**.

140.   <u>Commonality</u>. As required by Fed. R. Civ. P. 23(a)(2) and (b)(3), there are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

> a.   Whether Defendant unlawfully used, maintained, lost, or disclosed
>       Plaintiff's and Class Members' Private Information;

b.    Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.    Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d.    Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

e.    Whether Defendant owed a duty to Class Members to safeguard their Private Information;

f.    Whether Defendant breached its duty to Class Members to safeguard their Private Information;

g.    Whether computer hackers obtained Class Members' Private Information in the Data Breach;

h.    Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

i.    Whether Plaintiff and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

j.    Whether Defendant failed to provide notice of the Data Breach in a timely manner; and

k.    Whether Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

141.    Typicality, Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class member, was compromised in the Data Breach.

142.    Adequacy of Representation, Fed. R. Civ. P. 23(a)(4):  Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class.

Plaintiff's Counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

143.    <u>Predominance</u>. Defendant has engaged in a common course of conduct toward Plaintiff(s) and Class Members, in that all the Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

144.    <u>Superiority</u>, Fed. R. Civ. P. 23(b)(3): A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

145.    Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

146.    Likewise, particular issues are appropriate for certification under Rule 23(c)(4) because such claims present only particular, common issues, the resolution

CLASS ACTION COMPLAINT

of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

l. Whether Defendant failed to timely notify the public of the Data Breach;

m. Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

n. Whether Defendant's security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

o. Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

p. Whether Defendant failed to take commercially reasonable steps to safeguard consumer Private Information; and

q. Whether adherence to FTC Act data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach;

r. Whether Defendant failed to abide by its responsibilities under HIPAA.

147. Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendant.

/

/

/

/

## CAUSES OF ACTION

### First Count

### Negligence

### (On Behalf of Plaintiff and Class Members)

148.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

149.    Defendant DRSI required Plaintiff and Class Members to submit non-public personal information, individually and through their healthcare providers.

150.    By collecting and storing this data in DRSI's computer property, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard their computer property—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft.  Defendant's duty included a responsibility to implement processes by which it could detect a breach of their security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a Data Breach.

151.    Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

152.    Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant DRSI and Plaintiff and Class, which is recognized by state and federal laws and regulations including but not limited to HIPAA, as well as common law. Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a Data Breach.

153.   Defendant's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1).  Some or all of the healthcare, medical, and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

154.   In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

155.   Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

156.   Defendant breached its duties, and thus were negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

    a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

    b.    Failing to adequately monitor the security of their networks and systems;

    c.    Failure to periodically ensure that their email system had plans in place to maintain reasonable data security safeguards;

d.    Allowing unauthorized access to Class Members' Private Information;

e.    Failing to detect in a timely manner that Class Members' Private Information had been compromised; and

f.    Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

157.   It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry.

158.   It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

159.   Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

160.   Defendant's negligent conduct is ongoing, in that it still holds the Private Information of Plaintiff and Class Members in an unsafe and unsecure manner.

161.   Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

/

/

CLASS ACTION COMPLAINT

## Second Count

### Negligence *Per Se*

### (On Behalf of Plaintiff and All Class Members)

162.  Plaintiff re-alleges the above allegations as if fully set forth herein.

163.  Pursuant to the Federal Trade Commission Act, 15 U.S.C. § 45, Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

164.  Pursuant to HIPAA, 42 U.S.C. § 1302d, et seq., Defendant had a duty to implement reasonable safeguards to protect Plaintiff's and Class Members' Private Information.

165.  Pursuant to HIPAA, Defendant had a duty to render the electronic PHI they maintained unusable, unreadable, or indecipherable to unauthorized individuals, as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key." See definition of encryption at 45 C.F.R. § 164.304.

166.  Defendant breached its duties to Plaintiff and Class Members under the Federal Trade Commission Act and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

167.  Defendant's failure to comply with applicable laws and regulations constitutes negligence per se.

168.  But for Defendant's wrongful and negligent breach of their duties owed to Plaintiff and Class Members, Plaintiff(s) and Class Members would not have been injured.

169.  The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew

or should have known that it failed to meet its duties, and that Defendant's breach would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

170.   As a direct and proximate result of Defendant's negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

## Third Count

### Breach of Implied Contract

### (On Behalf of Plaintiff(s) and Class Members)

171.   Plaintiff re-alleges the above allegations as if fully set forth herein.

172.   Plaintiff and Class Members provided their Private Information to Defendant DRSI in exchange for Defendant's medical services, they entered into implied contracts with Defendant pursuant to which Defendant agreed to reasonably protect such information.

173.   Defendant solicited, offered, and invited Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their Private Information to Defendant directly or through its medical provider clients.

174.   In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations, including HIPAA, and were consistent with industry standards.

175.   Plaintiff and Class Members paid money, directly or indirectly through Defendant's medical provider clients, to Defendant with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

176.   Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

177.   Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of its implied promise to monitor their computer systems and networks to ensure that it adopted reasonable data security measures.

178.   Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

179.   Defendant breached its implied contracts with Class Members by failing to safeguard and protect their Private Information.

180.   As a direct and proximate result of Defendant's breach of the implied contracts, Plaintiff and Class Members sustained damages as alleged herein, including the loss of the benefit of the bargain.

181.   Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

182.   Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate long-term credit monitoring to all Class Members.

## Fourth Count

### Breach of Fiduciary Duty

### (On Behalf of Plaintiff(s) and Class Members)

183.   Plaintiff re-alleges the above allegations as if fully set forth herein.

184.   In light of the special relationship between Defendant DRSI and Plaintiff and Class Members, whereby Defendant became guardian of Plaintiff's and

Class Members' Private Information, Defendant became a fiduciary by its undertaking and guardianship of the Private Information, to act primarily for Plaintiff and Class Members, (1) for the safeguarding of Plaintiff's and Class Members' Private Information; (2) to timely notify Plaintiff and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

185.    Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of its relationship with its current and former patients and employees to keep secure their Private Information.

186.    Defendant breached its fiduciary duties to Plaintiff and Class Members by failing to diligently discover, investigate, and give detailed notice of the Data Breach to Plaintiff(s) and Class in a reasonable and practicable period of time.

187.    Defendant breached its fiduciary duties to Plaintiff and Class Members by failing to encrypt and otherwise protect the integrity of the systems containing Plaintiff's and Class Members' Private Information.

188.    Defendant breached its fiduciary duties owed to Plaintiff and Class Members by failing to timely notify and/or warn Plaintiff and Class Members of the Data Breach.

189.    Defendant breached its fiduciary duties to Plaintiff and Class Members by otherwise failing to safeguard Plaintiff's and Class Members' Private Information.

190.    As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended

CLASS ACTION COMPLAINT

and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in their continued possession; (vi) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiff(s) and Class Members; and (vii) the diminished value of Defendant's services they received.

191.    As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

## Fifth Count

### Unjust Enrichment

### (On Behalf of Plaintiff(s) and Class Members)

192.    Plaintiff(s) re-allege the above allegations as if fully set forth herein. Plaintiff(s) bring this claim individually and on behalf of all Class Members. This count is plead in the alternative to the breach of contract count above.

193.    Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including payments it receives on behalf of Plaintiff and the Class Members.

194.    As such, a portion of the payments made by or on behalf of Plaintiff and the Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

195.   Plaintiff and Class Members conferred a monetary benefit on Defendant. Specifically, they purchased goods and services from Defendant and/or its agents and in so doing provided Defendant with their Private Information. In exchange, Plaintiff and Class Members should have received from Defendant the goods and services that were the subject of the transaction and have their Private Information protected with adequate data security.

196.   Defendant knew that Plaintiff and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes.

197.   In particular, Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Personal Information.  Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profits at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security.

198.   Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

199.   Defendant failed to secure Plaintiff's and Class Members' Private Information and, therefore, did not provide full compensation for the benefit Plaintiff and Class Members provided.

200.   Defendant acquired the Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

201.   If Plaintiff and Class Members knew that Defendant had not reasonably secured their Private Information, they would not have agreed to provide their Private Information to Defendant.

202.   Plaintiff and Class Members have no adequate remedy at law.

203.   As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (a) actual identity theft; (b) the loss of the opportunity of how their Private Information is used; (c) the compromise, publication, and/or theft of their Private Information; (d) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (e) lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (f) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Private Information in their continued possession; and (g) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

204.   As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

205.   Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to

refund the amounts that Plaintiff and Class Members overpaid for Defendant's services.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

a) For an Order certifying this action as a class action and appointing Plaintiff and their counsel to represent the Class;

b) For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

c) For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

d) For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

e) Ordering Defendant to pay for not less than ten years of credit monitoring services for Plaintiff and the Class;

f) For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

g) For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

h) Pre- and post-judgment interest on any amounts awarded; and

i) Such other and further relief as this court may deem just and proper.

## **<u>JURY TRIAL DEMANDED</u>**

Plaintiff demands a trial by jury on all claims so triable.

Dated: July 9, 2024                     Respectfully submitted,


*/s/ Jill J. Parker*
Jill J. Parker (SBN 274230)
**PARKER & MINNE LLP**
700 S. Flower Street, Suite 1000
Los Angeles, CA 90017
Tel: (310) 882-6833
Fax (310) 889-0822
jill@parkerminne.com

Danielle L. Perry (SBN 292120)
**MASON LLP**
5335 Wisconsin Avenue, NW, Suite 640
Washington, DC 20015
Tel: (202) 429-2290
dperry@masonllp.com

*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT